ARTHUR D. LEVY (SB # 95659)
arthur@yesquire.com
GINA DI GIUSTO (SB #293252)
gdigiusto@heraca.org
NATALIE LYONS (SB #293026)
nlyons@heraca.org
HOUSING AND ECONOMIC RIGHTS ADVOCATES
P.O. Box 29435
Oakland, California 94604
Telephone: (415) 702-4551

BRYAN KEMNITZER (SB # 66401)
bryan@kbklegal.com
KRISTIN KEMNITZER (SB # 278946)
kristin@kbklegal.com
KEMNITZER, BARRON & KRIEG, LLP
354 Pine St.
5th Floor
San Francisco, CA  94104
Tel. (415) 632-1900

Attorneys for Plaintiffs
TAQUELIA WASHINGTON TOLAND AND GEORGIA TOLAND
Individually and on Behalf of All Others Similarly Situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TAQUELIA WASHINGTON TOLAND and GEORGIA TOLAND, individually and on behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONSTAR MORTGAGE LLC, a Delaware limited liability company; VERIPRO SOLUTIONS INC., a Delaware corporation, and DOES 1 through 20,<br><br>Defendants. | Case No. 3:17-cv-02575-JD<br><br>**DECLARATION OF EVAN HENDRICKS IN OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: August 13, 2020<br>Hearing Time: 10:00 a.m.<br>Courtroom 11<br><br>CLASS ACTION |

I, Evan Hendricks, say:

1. I submit this declaration as an expert witness. My qualifications are set forth in the attached CV, which is true and correct. These opinions are based on the "Materials Considered" as stated in my expert report, a copy of which is attached as Exhibit "A" to Mr. Kemp's Declaration, filed as ECF Document No. 86-1.

2. My opinions are based on the presumed fact and assumption that after the foreclosure sale of Plaintiffs' condominium in 2012, the deficiency balances associated with Plaintiffs' two mortgages were subject to the purchase money antideficiency protection, and that Plaintiffs had no personal legal obligation to pay all or any part of those balances.

3. Nationstar nonetheless reported that the second mortgage loan it was servicing had a current status of 180-days late, and a current past-due balance every month from November 2014 to March 2016. During this period, Nationstar's reported that the current past-due balance in November 2014 was $21,761. By the end of March 2016, it was $31,017. [NSM/Toland 004279-80.] This resulted in Nationstar reporting the second mortgage as having a total current balance of over $97,000 as of April 2016, a "charge-off" and 180 days past due.

4. In my opinion, Nationstar's credit reporting of Plaintiffs' second mortgage did not comport with established credit reporting standards. Nationstar's reporting was in contravention of industrywide credit report standards, established by the Consumer Data Industry Association's ("CDIA") "2017 Credit Reporting Resource Guide ®," (also known as the "CDIA Manual").

5. The CDIA Manual, the creation of which directly involved the "Big Three" CRAs, is designed to assure compliance with the accuracy standards set forth by the federal and state credit reporting statutes. And the CDIA is the trade organization created to represent the interests of the Big Three credit bureaus, and is the principal source of nearly all of the industry-created implementation standards for consumer credit reporting in the credit reporting industry.

6. The CDIA Manual sets forth the industry standards for mortgage loan reporting, which are commonly referred to as "Metro 2." Mr. Loll testified that Nationstar follows Metro 2 protocols. Metro 2 standards are specific how Nationstar should have reported a mortgage or

1 secured line of credit after a foreclosure sale in cases where the borrower is not responsible to pay
2 any balance remaining after the foreclosure sale.

3    7.    FAQ 52 in the CDIA Manual directly addresses post-foreclosure sale reporting of
4 mortgages. The Manual states in relevant part:

**52. Question: How should the different stages of foreclosure be reported?**

Answer: Use the following guidelines:

*****

**Foreclosure Completed** – Account Status Code **94** should be reported, which specifies "Foreclosure completed; there may be a balance due". The appropriate Payment Rating should be reported in conjunction with this Account Status. Discontinue reporting Special Comment Code **BO** (Foreclosure proceedings started) at this point.

<u>If the consumer is not responsible for the remaining balance on the account or there is no deficiency balance, report Account Status 94 and a Current Balance and Amount Past Due of zero. Report the Date Closed as the date the foreclosure was completed</u>.

If the consumer is held responsible for the remaining balance on the account, continue reporting Account Status 94. Report the remaining balance in the Current Balance and Amount Past Due fields, and as payments are made by the consumer, report a declining balance in both fields. When the Current Balance reaches zero, report the Date Closed as the date the account was paid in full.

<u>For credit reporting purposes, do *not* report Account Status Code 97 (Charge-off) after Account Status 94 has been reported</u>.

(Bolding and italics in original; underlining added.)

   8.    FAQ 52 makes clear that after the 2012 foreclosure sale, Plaintiffs' second mortgage should have been reported as Code 94 (foreclosure completed) and, because under California law Plaintiffs were not responsible for the deficiency balance, the current

1  and past due balances should have been reported as zero.  The mortgage should also have
2  been reported as "Closed" effective the date of the 2012 foreclosure sale.
3      9.     This Metro 2 standard has remained substantially the same for several
4  years, including the period of Nationstar's reporting of Plaintiffs' mortgage.
5      10.    CDIA Manual FAQ 38 is also relevant because it instructs how to report accounts
6  that are paid in full for less than the full balance.  That was precisely the status of Plaintiffs'
7  second mortgage after the 2012 foreclosure sale because they had no liability to pay the
8  deficiency—the loan was paid in full for less than the full amount.  This guideline states:

> **38. Question: How should accounts that are paid in full for less than the full balance (i.e., settled) be reported?**
>
> Answer: Report the following Base Segment fields as specified:
>
> ☐ Scheduled Monthly Payment Amount = zero
>
> ☐ Account Status Code = 13 or 61-65, as applicable
>
> ☐ Payment Rating = required when the Account Status Code is 13 or 65.  Blank fill for Account Status Codes 61-64.
>
> ☐ Special Comment = AU (Account paid in full for less than the full balance)
>
> ☐ Current Balance and Amount Past Due = zero
>
> ☐ Date of Account Information = the date the account was paid in full for less than the full balance
>
> ☐ Date Closed = For Installment and Mortgage accounts (Portfolio Types I and M), report the date the account was paid in full for less than the full balance. For Revolving and Line of Credit accounts (Portfolio Types R and C), report the date the account was closed to further charges. For Open accounts (Portfolio Type O), report the date the account was closed to further charges or paid in full, as applicable.
>
> (Bolding in original; underlining added.)

27      11.    This standard requires, in addition to reporting zero current and past due
28  balances and a closure date effective as of the date of the foreclosure sale, that the account

be reported with a special comment "AU," indicating paid in full for less than the full balance.

12. Nevertheless, even assuming that FAQ 38 would not be applied to the case of a foreclosure, FAQ 38 confirms that correct, industry-standard reporting under Metro 2 required Nationstar <u>at a minimum</u> to report Plaintiffs' mortgage with zero current and past due balances and the account as closed as of the date of the foreclosure sale, May 2012.

13. Instead, Nationstar reported Plaintiffs as 180-days late and with a "current balance" of $66,111 and additional "amounts past due," bringing the total current balance to over $97,000 as of April 2016. This did not comply with Metro 2 industry standards.

14. Metro 2 reporting standards reflect what is possibly the most important consumer credit reporting requirement—accuracy. If consumer report information is inaccurate, then it can harm consumers, financial institutions, users of credit reports, and even the economy as a whole. If a creditor reports a loan balance that the consumer does not owe, that not only harms the consumer by falsely portraying their credit history and credit worthiness, but other users of credit reports as well. In making credit decisions, other users may deny the consumer credit altogether, or charge them a higher interest rate or impose other more onerous credit terms, based on a reported balance or a lower credit score than the consumer rightfully would have had if the account had been accurately reported as uncollectable or with a zero balance. Thus, inaccurate reporting of a loan status or balance not only harms the consumer, but also distorts the decision-making process of users of credit reports. The accuracy and completeness requirement thus guarantees equal treatment for both consumers and users.

15. Another important standard in credit reporting coinciding with accuracy is completeness. In order to achieve both accuracy and completeness in credit reporting, it is necessary for a furnisher to portray the tradeline in its proper context. For example, while it was technically accurate before the foreclosure sale to report that Plaintiffs had an obligation to repay the predecessor to the Nationstar loan, it was, at a minimum, incomplete (and in my opinion, also inaccurate) to report that they still had an obligation

to pay Nationstar over $97,000 once the deficiency balance had become legally uncollectable after the 2012 foreclosure sale.

16. Nationstar's credit reporting harmed Plaintiffs' creditworthiness in at least two ways. First, Nationstar reported a *current* "status" of "180 days late" and a past-due balance of over $97,000. The existence of a long outstanding past-due balance, figuratively, can serve as a "scarlet letter" or a "deal-killer" that for all practical purposes renders a consumer ineligible for nearly all – if not all – forms of credit because creditors will not extend credit to consumers until they remove such past-due balances from their credit reports.

17. Second, the Nationstar tradeline, with its *current* "status" of "180 days late," constituted a "major derogatory" under the FICO scoring model. Accordingly, it unfairly reduced Plaintiffs' credit scores, impairing their ability to obtain credit. While Plaintiffs' credit scores were reduced by the foreclosure, Plaintiffs had no other significantly derogatory accounts on their credit reports other than the second mortgage. Thus, the Nationstar tradeline was a substantial factor in significantly reducing Plaintiffs' credit scores. Other than Nationstar's tradeline, the only derogatory tradelines on Plaintiffs' credit reports were the first and second Bank of America mortgages. Otherwise, their credit reports were clean.

18. Bank of America reported the first mortgage to Experian as settled in full by a foreclosure, and with a zero balance. BofA reported only five late payments, the last of which was in May 2012. BofA reported the second mortgage without any outstanding balance, with late payments over the period from December 2011 through November 2013.

19. These tradelines reduced Plaintiffs' credit scores, but it does not follow that Plaintiffs had "poor credit." Experian reported their credit as "fair," not poor, even including the Nationstar tradeline.

20. A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based

entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union, are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate and credit opportunities. A credit score of 620 and below is widely regarded as "sub-prime."

21.  Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

22.  The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[1]

**35%--Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?** This relates to "inquiries" that creditors make when you apply for credit.

---

[1] These parameters are published in Chapter 1 of both Editions of "Credit Scores and Credit Reports," op. cit. They are available at www.myfico.com.

**10% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

23. Here, approximately 35% of Plaintiffs' credit scores was weighted by "[l]ate payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages."  The March 2017 Experian report for Georgia Toland reported a "fair" credit score of 624.  The report states that her score was reduced because "You have a serious delinquency (60 days past due or greater) or derogatory indicator on your credit report."  This reference clearly included the reporting of the second mortgage.  Her score would have been higher but for Nationstar's reporting of the second mortgage.

24. Likewise, the March 2017 Experian report for Taquelia Washington reported a "fair" FICO score of 637.  Her score would have been higher but for Nationstar's reporting of the second mortgage.

25. Regardless of the impact of the BofA tradelines on Plaintiffs' credit scores, Nationstar's inaccurate and incomplete tradeline made it worse, significantly reducing their score further.  Under the FICO scoring model, the Nationstar tradeline was a "major derogatory." That major derogatory status is certain to lower any and every consumer's credit score – regardless of how "poor" or "excellent" that consumer's credit is.

26. Nationstar reported a large outstanding balance, in contrast to BofA, which did not report any balance.  Further, in addition to reporting payment status as a "charge-off", as opposed to properly under Metro 2 as "foreclosure completed" (Account Status Code 94) with a zero balance, Nationstar continued to report the second loan to Experian as 180 past due for 27 additional months past BofA's reporting of the same loan, from February 2014 through April 2016.

27. Nationstar's report and the resulting significant reduction in Plaintiffs' credit scores negatively impacted and damaged Plaintiffs, regardless of whether they applied for and were denied credit.  An inaccurate and incomplete report impacts consumers by reducing their credit scores, thus tending to make it harder or more expensive to obtain credit.  This principle is reflected in federal and California credit reporting law in the requirements that furnishers (like

Nationstar) are prohibited from providing inaccurate or incomplete reports, in the procedures requiring such reports can be removed, and in the remedies against furnishers for their failures to report accurately and completely and to remove such reports.  These provisions are equally available to borrowers with good, fair, and poor credit alike, and reflect the damage of inaccurate and incomplete tradelines to all consumers, regardless of their particular ability to obtain credit at any given time and of any credit denials.

28. Performing the type of "impact analysis" which precisely quantifies the impact, or the exact reduction in credit score points, or the "materiality," is not necessary to determine whether a major derogatory account like the Nationstar tradeline was a substantial factor in significantly reducing a credit score, and negatively impacting a consumer; such inaccurate tradeline are unlawful and are required to be removed. Their removal is mandatory because they are inaccurate, incomplete and damaging.  Removal does not depend on whether there have been any specific credit denials or whether credit would have been denied if it had been applied for.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 5th day of June, 2020 at Cabin John, Maryland.

/s/ Evan Hendricks
Evan Hendricks

**LOCAL RULE 5-1 ATTESTATION**

I, Arthur D. Levy, am the ECF user whose ID and password are being used to file this document. In compliance with Local Rule 5-1(i)(3), I hereby attest that Evan Hendricks has concurred in the filing of this document with his electronic signature.

DATED: June 8, 2020                    ___/s/  Arthur D. Levy_____

                                                            Arthur D. Levy